IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
February 9, 2021 Session

**STATE OF TENNESSEE v. JONATHAN MICHAEL BASS**

**Appeal from the Circuit Court for Williamson County
Nos. II-CR180363A, II-CR180266B, II-CR180364, II-CR180654
Deanna B. Johnson, Judge**

_____

**No. M2020-00490-CCA-R3-CD**
_____

The Defendant, Jonathan Michael Bass, pleaded guilty to one count of theft of property valued at $2,500 or more, but less than $10,000, two counts of theft of property valued over $1,000 but less than $2,500, one count of theft of property valued at $1,000 or less, three counts of "doctor shopping," and three counts of prescription drug fraud. The trial court imposed partial consecutive sentencing for an effective sentence of eight years to be served on supervised probation. On appeal, the Defendant asserts that the trial court erred by ordering partial consecutive sentences. After review, we affirm the trial court's judgments.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, P.J., and ROBERT H. MONTGOMERY, JR., J., joined.

Vanessa Pettigrew Bryan, District Public Defender, Brian D. Wilson, Assistant District Public Defender (on appeal), and J. Gregory Burlison, Assistant District Public Defender (at hearing), Franklin, Tennessee, for the appellant, Jonathan Michael Bass.

Herbert H. Slatery III, Attorney General and Reporter; Caitlin Smith, Assistant Attorney General; Kim R. Helper, District Attorney General, for the appellee, State of Tennessee.

**OPINION
I. Facts
A. Background**

This case arises from the Defendant's participation in thefts at Macy's and Walmart, fraudulently obtaining prescriptions for controlled substances from numerous physicians,

and failing to fulfill an agreement to ship items for cancer patients after accepting payment for the items. A Williamson County grand jury issued multiple indictments charging the Defendant with theft and other fraudulent conduct. The Defendant's wife, Lindsay King, was indicted as a co-defendant in some, but not all, of the charges.[1] Cumulatively, the Defendant was charged with one count of theft of property valued at $2,500 or more but less than $10,000, two counts of theft of property valued over $1,000 but less than $2,500, three counts of theft of property valued at $1,000 or less, seven counts of doctor shopping and seven counts of prescription drug fraud. Due to the numerous indictments and charges, we summarize each of the charges in the indictments and the evidence supporting the trial court's acceptance of the Defendant's guilty pleas as follows:

### 1. II-CR180266 – Theft of $2,500 or More but Less than $10,000

On April 9, 2018, in case II-CR180266, the grand jury indicted the Defendant for theft of property valued at $2,500 or more but less than $10,000. The indictment alleged that during the time period of September 1, 2017, through October 30, 2017, Rhonda Svedeman, Dallas, Texas resident and business owner of Chemo Cold Packs, placed an order with Ms. King for "cold caps." Ms. Svedeman sent $3,550 as payment for cold caps that never arrived in Texas. Sheriff's Department Detective Grant Benedict investigated and found bank records confirming the wire of the money to Ms. King's account. The Defendant insisted that he had shipped boxes containing the cold caps and was unaware that they had not arrived until Ms. Svedeman notified him that the boxes had not arrived. The Defendant confirmed that the cold caps were stored in a room of their home, contrary to Ms. King's assertion that the cold caps were kept in a separate storage area. The Defendant told the detective that he "hoped to provide bank records" to support his claim that the items were shipped. No bank records were produced and Federal Express showed that no order had been placed to send those items or for pick-up from the Defendant's residence.

### 2. II-CR180363 -  Thefts from Macy's Department Store

On June 11, 2018, in case II-CR180363, the grand jury indicted the Defendant for two counts of theft of property valued over $1,000 but less than $2,500 (Counts 1 and 2) and two counts of theft of property valued at $1,000 or less (Counts 3 and 4). On January 15, 2018, the Defendant and Ms. King entered the backstage area of Macy's located at the Cool Springs Galleria in Williamson County. Macy's employees were familiar with the Defendant and Ms. King due to "prior incidents" in the store. Surveillance video footage recorded the Defendant and Ms. King hiding unpaid items, valued at $4,550, in Ms. King's purse and leaving the store (Count 1). On January 17, 2018, two days later, the Defendant

---

[1] Ms. King pleaded guilty to her role in the offenses in exchange for a four-year probation sentence.

entered the backstage area of Macy's and walked around the store collecting items. He then took the items to an area near an exit where Ms. King entered, took the items, and left the store without paying for them. The items were valued at $1,602 (Count 2).

Counts 3 and 4 occurred on January 18, and January 19, 2018, at the same Macy's department store. The Defendant alone was charged with stealing items valued at less than $1,000.

### 3. II-CR180364 – Theft from Walmart

On June 11, 2018, the grand jury indicted the Defendant for theft of property valued at $1,000 or less from a Walmart located in Williamson County. The indictment alleged that on March 11, 2018, the Defendant entered a Walmart located on Mallory Lane and took $657 worth of merchandise and left the store without paying for the items.

### 4. II-CR180654 – Doctor Shopping and Prescription Drug Fraud

On October 8, 2018, the grand jury issued a fourteen-count indictment charging the Defendant with seven counts of doctor shopping, a Class A misdemeanor, and seven counts of prescription drug fraud, a Class D felony. As part of the investigation, police obtained the Controlled Substance Monitoring Database report for the Defendant. The report revealed that the Defendant had obtained pain pill prescriptions from various doctors within short periods of time and then filled the prescriptions at different pharmacies. According to the report, on August 29, 2017, Dr. Jeffrey Watson prescribed the Defendant oxycodone, and the prescription was filled at a Franklin Kroger on the same day. The following is a summary of the prescriptions the Defendant obtained and was later indicted for:

Count 1:  DOCTOR SHOPPING
On August 31, 2017, The Defendant failed to notify Dr. Frank Molnar, a physician who wrote the Defendant a prescription for oxycodone, that he had already received a prescription for oxycodone from Dr. Jeffrey Watson on August 29, 2017.

Count 2: PRESCRIPTION DRUG FRAUD
On August 31, 2017, the Defendant used the prescription Dr. Molnar issued to obtain oxycodone by misrepresentation, fraud, forgery, deception or subterfuge.

Count 3: DOCTOR SHOPPING

On September 11, 2017, the Defendant failed to tell Dr. Gregory Cook that he had received a prescription for oxycodone from Dr. Frank Molner on August 31, 2017. Dr. Cook wrote the Defendant a prescription for oxycodone.

Count 4: PRESCRIPTION DRUG FRAUD
On the same day the Defendant met with Dr. Cook, he used Dr. Cook's prescription to obtain oxycodone by misrepresentation, fraud, forgery, deception or subterfuge at a Franklin CVS Pharmacy.

Count 5: DOCTOR SHOPPING
On September 14, 2017, the Defendant failed to tell Dr. Christopher Hendrix that he had received a prescription for oxycodone from Dr. Gregory Cook on September 11, 2017.

Count 6: PRESCRIPTION DRUG FRAUD
On the same day the Defendant received the prescription, he filled Dr. Hendrix's prescription for oxycodone at a Franklin CVS Pharmacy.

Count 7: DOCTOR SHOPPING
On September 15, 2017, the Defendant failed to tell Dr. Katie Norwind, who prescribed hydrocodone for the Defendant, that Dr. Hendrix had issued and the Defendant had filled a prescription for oxycodone the day before on September 14, 2017.

Count 8: PRESCRIPTION DRUG FRAUD
On that same day the Defendant received the prescription, he filled Dr. Norwind's prescription for hydrocodone at a Franklin, Tennessee, Kroger.

Count 9: DOCTOR SHOPPING
On September 16, 2017, the Defendant failed to tell Dr. Tanner Boyd, who issued the Defendant a prescription for oxycodone, that Dr. Katie Norwind, had given him a prescription for hydrocodone on September 15, 2017.

Count 10: PRESCRIPTION DRUG FRAUD
After receipt of Dr. Boyd's prescription for oxycodone, the Defendant filled the prescription on the same day, September 16, 2017, at a Franklin, Tennessee Publix Pharmacy.

Count 11: DOCTOR SHOPPING

On September 23, 2017, the Defendant failed to tell Dr. Jeffrey Jobe, who gave the Defendant a prescription for Tramadol, that Dr. Tanner Boyd had given him a prescription for oxycodone on September 16, 2017.

Count 12: PRESCRIPTION DRUG FRAUD
On the same day that the Defendant obtained the prescription from Dr. Jobe by misrepresentation and deception, he filled the prescription for the Schedule II drug at a Franklin, Tennessee CVS Pharmacy.

Count 13: DOCTOR SHOPPING
On October 20, 2017, the Defendant failed to tell Dr. Joseph Blythe, who prescribed the Defendant oxycodone, that Dr. Jobe had prescribed the Defendant Tramadol on September 23, 2017.

Count 14: PRESCRIPTION DRUG FRAUD
The Defendant filled the fraudulently obtained prescription for oxycodone on the same day he met with Dr. Blythe, October 20, 2017, at a Kroger in Franklin, Tennessee.

In a negotiated plea agreement encompassing all the charges, the Defendant pleaded guilty to: one count of theft of property valued at $2,500 or more but less than $10,000, a Class D felony; two counts of theft of property valued over $1,000 but less than $2,500, a Class E felony; one count of theft of property valued at $1,000 or less, a Class A misdemeanor; three counts of doctor shopping, a Class A misdemeanor; and three counts of prescription drug fraud, a Class D felony. Pursuant to the agreement, the trial court dismissed two counts of theft that had occurred at Macy's, four counts of doctor shopping, and four counts of prescription drug fraud. The trial court was to determine the length and manner of service of the sentences after a sentencing hearing.

## B. Sentencing Hearing

Franklin Police Department Detective Zach Wolfe testified about his investigation into allegations of doctor shopping and prescription drug fraud. It began when the Defendant and Ms. King reported a vehicle burglary. Detective Wolfe recalled that the couple reported stolen a large amount of controlled substances. The Defendant and Ms. King claimed that on February 5, 2018, someone stole approximately eighty-four 30mg oxycodone pills, twenty-five 8mg Zofran, ninety 10mg tamoxifen, four fentanyl patches, sixteen 10mg zolpidem, and sixteen Xanax, from their vehicle. They explained that they had locked the vehicle but one of the doors did not lock. Ms. King stated that she needed a police report in order to have her medications refilled and that she had a chemotherapy appointment the following day.

Although not investigated by Detective Wolfe, the record reflects that a similar police report, filed in June 2017, indicated that the Defendant and Ms. King had claimed twelve Ambien, sixty oxycodone, and thirty tamoxifen had been stolen from their vehicle. They reported that the passenger door was damaged and did not lock. Ms. King had reported that she had surgery scheduled for the next morning.

Based upon the February 2018 vehicle burglary report, Detective Wolf requested information related to the Defendant from the Controlled Substance Monitoring Database ("CSMD") that tracks all opiate prescriptions in the State of Tennessee. Detective Wolf explained that Tennessee law prohibited duplicate prescriptions for opiates within a thirty-day period. He said that people sometimes try to obtain prescriptions within a day or two of another prescription without detection due to the delay in downloading prescription information into the database. Review of the CSMD report related to the Defendant revealed an indication of doctor shopping, or that the Defendant was seeking pain pill prescriptions illegally by visiting multiple doctors without notifying a doctor of previous prescriptions.

After reviewing the CSMD report, Detective Wolf issued subpoenas for the medical providers to further investigate. During this portion of the investigation, Detective Wolf learned that the Defendant had been employed at Expert Spine Care where he had taken a prescription pad and forged prescriptions. Detective Wolf then spoke with the Defendant, who did not respond to the allegation of stealing a prescription pad from Expert Spine Care but acknowledged that he had "a problem" with opiates. Detective Wolf testified that he was aware of shoplifting incidents at Macy's that occurred before his investigation of possible doctor shopping began and of a shoplifting incident at a Walmart in Nashville, Tennessee, that occurred after his investigation. He was also aware that the Defendant had been arrested for driving on a suspended license.

Detective Wolf testified that, based on his experience, he believed that doctor shopping and prescription drug fraud was a "problem" in Williamson County. He stated, "people that do get hooked to opiates, pain pills specifically, . . . usually start going down a dark road. Thefts are common because they need that money to go and buy product. But also, a lot of them will turn to heroin." Detective Wolf confirmed that heroin is not a substance one can obtain by prescription; a buyer of heroin would have to obtain it illegally from a drug trafficker.

Detective Wolf testified that the Defendant's criminal behavior, as relevant to his investigation, extended over the course of a year or a little longer. He confirmed various criminal acts were committed beginning late in 2017 and extended through 2018 to a citation for a suspended license in 2019. The trial court noted that the Defendant had

admitted to using one to two grams of heroin and fentanyl daily. Upon further questioning from the trial court, Detective Wolf testified that, in his experience, a gram a day is "pretty common with heroin addicts."

Franklin Police Department Detective Craig Wright testified that, after Detective Wolf's investigation was complete, the police department was notified of allegations that the Defendant was obtaining prescriptions by fraud again. Detective Wright began his investigation of the subsequent allegations in December 2018. Southern Hills Hospital notified the police department that the Defendant had presented with a "legitimate medical situation." Due to the Defendant's prior involvement in obtaining prescriptions by fraud, he had been placed on an "alert list." Based upon the Defendant being on the list, hospital staff prescribed a non-controlled substance. Upon learning of the prescription, the Defendant became argumentative and disorderly, demanding Xanax. On January 2, 2019, the Williamson Medical Group also notified the police department about an incident with the Defendant. The Defendant presented with a legitimate medical concern, an abscess, and a doctor prescribed three-days-worth of OxyContin. The Defendant soon returned "demanding" more medication and became argumentative with the medical staff at the facility.

A third incident occurred in February 2019, when the Defendant attempted to fill a prescription at Walgreens and did not like the process the pharmacy was using to do so. He became loud and angry, refusing to leave until pharmacy employees threatened to call the police. When the police arrived, they spoke with the Defendant and ultimately issued a citation for driving on a suspended license. Detective Wright spoke with the Walgreens pharmacist and learned that the Defendant had been trying to fill a prescription from St. Thomas and a prescription from Beauchamp Animal Hospital. Detective Wright contacted Dr. Dare, the veterinarian at Beauchamp Animal Hospital, and learned that the Defendant had "passed a bad check" at the animal hospital and that the Defendant's father later paid the debt in order to avoid criminal prosecution. Dr. Dare told Detective Wright that he was concerned because the Defendant asked for a large number of alprazolam for his dog. Dr. Dare explained that, due to a dog's fast metabolism, their bodies require much smaller doses of a controlled substance than a human. Detective Wright explained that addicts sought prescriptions from veterinarians because pet prescriptions were not entered into CSMD.[2]

Detective Wright testified that, in March 2018, he was notified that the Defendant was involved in a traffic stop. Detective Wright went to the location and spoke with the

_____

[2] Upon further questioning by the trial court, Detective Wright noted that the law had since changed the problem with opiate addiction and veterinarians were required to enter into CSMD any prescription involving a controlled substance.

Defendant about his investigation, issuing a "stern warning" that he would arrest the Defendant if he went to another physician seeking prescriptions. He also offered to assist the Defendant in getting help with an addiction if he wanted help. Detective Wright did not see the Defendant again. He explained that, at the time he last saw the Defendant, he was in the middle of his investigation and had not yet gathered enough evidence to arrest or indict the Defendant.

Detective Wright testified that, in his opinion, opiate addiction was a problem in Williamson County. He explained that once addicts could not obtain more prescriptions, they would seek heroin or a combination of heroin and fentanyl resulting in numerous overdoses and overdose deaths. Detective Wright reiterated his concern that the use of heroin and fentanyl is deadly and "a big issue" in Franklin, Tennessee.

The State submitted the presentence report for the trial court's consideration in sentencing. The Defendant submitted a Certificate of Eligibility for Diversion. Michael Bass, the Defendant's father, then testified on the Defendant's behalf. Mr. Bass was a retired Metro Nashville Police officer. He testified that he and the Defendant's mother divorced when the Defendant was young. The Defendant never caused any trouble growing up and graduated from Ravenwood High School. Following high school, the Defendant enrolled in "Columbia State University" and studied to become an EMT while employed at Williamson Medical Center.

Mr. Bass noticed a change in his son when he began dating Ms. King. Ms. King was "quite older" than the Defendant and had four children. The Defendant moved in with Ms. King, and "the EMT and the school thing kind of fell apart." The Defendant began working as an anesthesiologist tech at Vanderbilt. Mr. Bass believed the Defendant was doing well in the job, but one day the Defendant called Mr. Bass and said he intended to quit his job to obtain his pilot's license. Mr. Bass unsuccessfully attempted to discourage the Defendant from quitting his job. The pilot's license "kind of fell apart," and the Defendant gained employment at Sports Season, a sporting goods store.

In 2014, Ms. King developed breast cancer, and she and the Defendant married. The Defendant began asking Mr. Bass for money but soon obtained a job at Ascension St. Thomas Hospital Midtown ("St. Thomas Hospital") making "really good money." Mr. Bass was out of town when the Defendant called to tell him that the Defendant's employment with St. Thomas Hospital had been terminated. The Defendant was evasive about the reason for his discharge and, according to Mr. Bass, was "never really employed" after this time. Toward the end of 2014, Mr. Bass began seeing significant change in the Defendant and sensed something was wrong.

The Defendant was hospitalized on several occasions and during one occasion, Mr. Bass took the opportunity to ask about some changes in the Defendant's behavior that were concerning. In response, the Defendant became "combative" toward Mr. Bass and denied any drug use. The Defendant frequently asked Mr. Bass and the Defendant's grandmother, Mr. Bass's mother, for money which led to several arguments. In 2018, Mr. Bass learned of the Macy's theft charges and was "dumbfounded." He said this type of behavior continued for about a year and a half.

At some point, the Defendant expressed a willingness for treatment and enrolled in a five-day detox program at Rolling Hills. The Defendant was then to enter JourneyPure in Knoxville for a thirty-day rehabilitation program. The Defendant stayed for a week before deciding he did not "fit[] in." The Defendant moved in with Mr. Bass and enrolled in an out-patient program at Rolling Hills. Mr. Bass believed the Defendant was doing well in the program and progressing. The Defendant began taking suboxone through a doctor to help with his rehabilitation. The Defendant obtained employment with Papa John's and, according to Mr. Bass, was progressing into leadership roles with the company. Mr. Bass stated that the Defendant had an excellent support system and hoped to return to a career in the medical field.

On cross-examination, Mr. Bass confirmed that he became suspicious that something was "not right" with the Defendant in 2015 and that the Defendant did not seek treatment until August 2019. He acknowledged that, in May 2016, Ms. King set up a credit card account in the Defendant's grandmother's name. The Defendant denied any involvement in establishing the fraudulent account, and the account was "dissolved." Mr. Bass stated that no formal charges were ever filed regarding this account.

The Defendant testified that he was drawn to the medical/first responder field early in his life. At age sixteen, he served as a volunteer firefighter for the Nolensville Fire Department and then worked as a "transporter" at Williamson Medical Center after he finished "EMT school." He then worked at Vanderbilt Hospital and learned "blood management skills." As he was planning for his career and future, he never imagined he would face criminal charges. He explained that his presence in court was a result of "some bad decisions…, a bad marriage, a very volatile marriage," and an ill wife.

When the Defendant's wife was first diagnosed with cancer, the Defendant had a "working contract" with a profusion company and worked at St. Thomas Hospital. He described this as a good job allowing him to provide for his wife and her four children. The Defendant said that his addiction issues began after his second shoulder surgery when he was referred to a pain clinic. He described his addiction, saying "the pills start, they run out and then the pills on the street run out, and then you know, the heroin starts and then the fentanyl starts laced with that. And it's just a very vicious cycle." The Defendant said

that he developed a tolerance to the pain medication that caused him to take more and more pills. If he stopped taking the pills, he experienced withdrawal. The Defendant began taking Xanax to try to counteract the withdrawal symptoms.

The Defendant testified that he had a strong support system but had not relied on his support system out of fear and guilt. Since addressing his addiction, he believed he had stronger relationships. The Defendant stated that he was accepting responsibility for the thefts at Macy's, Walmart, and "the cold-caps." He said that, if not for his addiction, he would never have stolen because he knew that stealing was wrong. He expressed remorse for "the things [he] did." He said that May 26, 2019, was the day he decided to quit using drugs. He admitted at an emergency room and was transferred to a detox program. Following detox, he wanted to continue treatment and enrolled at JourneyPure. He said the facility was understaffed, "nasty," and dirty. He felt this facility was "not the right fit," so he enrolled in an out-patient program at Rolling Hills.

The Defendant testified that he found a suboxone clinic in Franklin, Tennessee, for treatment for a few months and then transferred to a clinic in Springfield, Tennessee. He described suboxone treatment as a "tremendous backbone" to his recovery. The Defendant talked about his counseling and the oversight at the suboxone clinic. The Defendant denied any alcohol use since he had entered treatment in 2019. When confronted with the presentence report indicating he last drank alcohol in 2020, the Defendant suggested that the probation officer who conducted the presentence interview misunderstood him. He confirmed his understanding that there were alternative sentencing options the trial court could order in his case. He stated he was willing to accept any recommendations from the court "to show that, you know, this is something I'm very serious about."

The Defendant reported having applied to a Day Reporting Center and a Drug Recovery Court program. The Day Reporting Center declined to admit him into their intensive program due to his use of suboxone but recommended an additional two hours of treatment, once a week. The Drug Recovery Court program did not "accept" the Defendant "under the circumstances." The Defendant stated that he would have been willing to participate in either program. The Defendant did not attend AA or NA meetings but attended therapy "at [his] clinic." The Defendant identified a letter from David J. Williams, Mr. Bass's long-time friend. The letter detailed how he had come to mentor the Defendant at the request of Mr. Bass. Mr. Williams wrote that the Defendant had expressed remorse and a strong desire to address his addictions. The Defendant also identified a letter from his uncle that outlined the Defendant's remorse and efforts to rehabilitate.

The Defendant testified about his intention to return to work in the medical field, specifically "Blood Management Technologies." He acknowledged Detective Wright's concern about his access to possible triggers in the medical field but believed that

"whatever is in front of me . . .it won't phase me." The Defendant expressed concern about how a felony record might prevent him from achieving his career goals. When asked if he was willing to accept any punishment the trial court imposed, the Defendant responded, "I'm willing to do anything."

On cross-examination, the Defendant admitted that, in 2017, Ms. King borrowed $20,000 from Sam Ray, an acquaintance. He agreed that he promised Mr. Ray he would pay the money back with a bonus he was to receive from work. He denied any knowledge of the details of the arrangement, explaining that Ms. King orchestrated the whole incident. He contended it was "all my wife." He agreed that he did not pay Mr. Ray the promised money. Upon further questioning by the trial court, the Defendant admitted that he was with Ms. King when Mr. Ray gave her the check at a bank in Cool Springs. Although present at the transaction, the Defendant denied any knowledge of why Mr. Ray gave Ms. King the check. The trial court noted that it seemed "far fetched" that the Defendant had no knowledge about a "random guy giving your wife $20,000." The Defendant maintained that the extent of his knowledge was that Mr. Ray gave his wife a check.

The Defendant testified that between 2013 and 2016, he worked at St. Thomas Hospital. During this time, he "obtained prescription fraud unbeknown" and was terminated but not criminally charged. After termination from his employment with St. Thomas, the Defendant worked for Dr. Blythe, a neurosurgeon, without telling Dr. Blythe about the prescription fraud incident at St. Thomas Hospital. He explained that he did not disclose this information because he wanted to start his new job with "a clean slate."

Upon further questioning from the trial court, the Defendant explained what occurred at St. Thomas Hospital in more detail. He obtained prescription pads from post-surgery recovery. He lied to the surgical nurses to gain access to the prescriptions, forged the prescriptions given to him approximately seven or eight times, and then took the fraudulent prescription to a pharmacy to obtain pain medication. When this conduct was discovered, he was terminated. He explained that he was employed with Dr. Blythe for a short period before Dr. Blythe learned that the Defendant was forging the physician's signature on prescriptions for the Defendant's use.

The Defendant testified that he was charged with a theft in Davidson County that was later dismissed based upon his payment of restitution. The Defendant could not explain from where he was getting money from 2017 to 2018 to pay for the heroin and fentanyl he was using at the time. He said that Ms. King "always had . . . some kind of scam" and he admitted that he was "involved." The Defendant denied any knowledge of the "cold-caps." He said that all he knew about this incident was that the "shipments" were "out front" and then "they weren't." Upon further questioning, he admitted that he told

Detective Benedict that there never were any shipments but maintained that he was not involved in the cold-caps order.

The Defendant testified that he stole perfume from Macy's. About this arrest, he said that he "got busted" after a "sting set up." He said that he had sold the stolen perfume. When asked further details, he stated that Ms. King "handled all of that." He recalled that he was trying to work odd jobs while Ms. King handled the stolen items. When confronted with his prior testimony that he was not working at this time, he said "I had a drug issue and that was controlling everything." Upon further questioning about how he paid for heroin, he admitted that he used money given to him by his grandmother. He maintained that he had no knowledge of the credit card account fraudulently established in his grandmother's name. The Defendant admitted that the two police reports, filed in 2017 and 2018, regarding items stolen during a vehicle burglary were false reports. The Defendant agreed that his criminal behavior had occurred over at least a three-year period.

The State called witnesses to testify about the Defendant's denial of any knowledge about the loan with Sam Ray and his denial that, during his presentence report interview, he stated that he had last drunk alcohol in 2020. The Defendant maintained that he had not drunk any alcohol since he entered treatment and the indication otherwise on the presentence report was a misunderstanding. Michelle Banks conducted the presentence interview with the Defendant and prepared the presentence report for sentencing. At the sentencing hearing, she confirmed that the Defendant had not only told her that he had most recently drunk alcohol in 2020 but that he had also written the response on the presentence report questionnaire. As to the Defendant's denial of any involvement in the loan from Sam Ray, Dana McClendon, an attorney retained by Mr. Ray to address the failure to repay the $20,000 loan, testified about his communication with the Defendant about repayment of the loan and a document he had reviewed indicating the Defendant promised to repay the loan.

The trial court addressed a victim impact letter submitted by Ms. Svedeman. In the letter, Ms. Svedeman, a cancer survivor, described her small company with the main goal of helping cancer patients. Ms. Svedeman purchased the cold caps to help cancer patients prevent hair loss due to chemotherapy. The sum, $3,550, was "a huge loss" for their small company.

After hearing this evidence, the trial court summarized the testimony and stated that it found Ms. Banks and Mr. McClendon's testimony credible but not the Defendant's testimony. The trial court noted that the Defendant "minimized his conduct" during his testimony, and the trial court identified conflicting testimony from the Defendant that indicated a lack of candor. The trial court then recited the statutory considerations used in determining the appropriate sentence. The trial court stated that the Defendant was to be

sentenced as a Range I, standard offender and had pleaded guilty to; three counts of prescription drug fraud, three counts of doctor shopping, one count of theft of property valued over $2,500 for his role in the cold-caps incident, two counts of theft of property valued over $1,000 at Macy's, and one count of theft of property valued under $1,000 at Walmart. The trial court noted that some of the charges had been dismissed as part of the plea negotiations and some criminal behavior had never been charged. The trial court mentioned the stolen prescriptions from St. Thomas Hospital and Dr. Blythe. In addition, it considered the Defendant's admission to purchasing illegal drugs, heroin and fentanyl, from drug traffickers. In mitigation, the trial court found that the Defendant had engaged in "self-rehabilitation" by gaining employment and seeking treatment.

The prescription drug fraud convictions, Class D felonies, had a sentencing range of two to four years. The trial court sentenced the Defendant to three years for each of the prescription drug fraud convictions and eleven months and twenty-nine days for each of the doctor shopping convictions, Class A misdemeanors (II-CR180654). Noting the "egregious" circumstances in case II-CR 180266, where the Defendant deprived cancer patients of a treatment product and the financial damage to a small company seeking to help cancer patients, the trial court imposed a three-year sentence for theft of property valued at $2,500 or more but less than $10,000, a Class D felony. In case II-CR180364, the Macy's thefts, the sentencing range for the two Class E felonies was one to two years, and the trial court imposed two-year sentences for each conviction. Finally, the trial court imposed a sentence of eleven months and twenty-nine days for the Walmart theft of property valued at $1,000 or less, a Class A misdemeanor.

Based upon the numerous charges against the Defendant in the four indictments as well as the uncharged criminal conduct of the Defendant, the trial court found that the Defendant had an extensive record of criminal activity. *See* T.C.A. § 40-35-115(b)(2) (2019). Based upon this finding, the trial court ordered partial consecutive sentencing for an effective sentence of eight years. The trial court declined to grant judicial diversion but ordered that the effective eight-year sentence be served on supervised probation. It is from these judgments that the Defendant now appeals.

## II. Analysis

On appeal, the Defendant asserts that the trial court erred when it imposed partial consecutive sentences. He claims that the trial court's failure to articulate its reasoning on the record requires reversal of the trial court's imposition of an eight-year probation sentence. He argues that the trial court made a "clearly erroneous assessment of the proof" and that his sentence does not comply with the purposes and principles of sentencing. The State responds that the trial court specified the Defendant's crimes in support of its finding

that the Defendant had an extensive criminal history and that those findings are supported by the record. We agree with the State.

Our supreme court has adopted an abuse of discretion standard of review for sentencing and has prescribed "a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012). The application of the purposes and principles of sentencing involves a consideration of "[t]he potential or lack of potential for the rehabilitation or treatment of the defendant . . . in determining the sentence alternative or length of a term to be imposed." T.C.A. § 40-35-103(5) (2019). Trial courts are "required under the 2005 amendments to 'place on the record, either orally or in writing, what enhancement or mitigating factors were considered, if any, as well as the reasons for the sentence, in order to ensure fair and consistent sentencing.'" *Bise*, 380 S.W.3d at 698-99 (quoting T.C.A. § 40-35-210(e)). Under the holding in *Bise*, "[a] sentence should be upheld so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Id*. at 709-10.

With respect to consecutive sentencing, our supreme court has held that the standard of review adopted in *Bise* "applies similarly" to the imposition of consecutive sentences, "giving deference to the trial court's exercise of its discretionary authority to impose consecutive sentences if it has provided reasons on the record establishing at least one of the seven grounds listed in Tennessee Code Annotated section 40-35-115(b)." *State v. Pollard*, 432 S.W.3d 851, 861 (Tenn. 2013).

As to the Defendant's contention that the trial court failed to provide reasons on the record to establish that the Defendant had an extensive history of criminal activity, we disagree. Our review of the record reveals that the trial court made lengthy findings, more than thirty-five pages of the transcript, at the sentencing hearing. The trial court recounted the testimony in detail, emphasizing the Defendant's criminal activity, both charged and uncharged. The trial court's findings are more than adequate for our review.

The trial court found that the defendant had a lengthy criminal history as evidenced by the presentence investigation report, witness testimony, and the Defendant's own statements. The trial court also noted the Defendant's lack of candor with the court and that his testimony was not credible. The trial court further noted the chronology of the offenses, highlighting instances where the Defendant would have been released from jail on bond at the time he committed another offense. The trial court recounted the Defendant's admissions to illegal drug use, uncharged thefts, and false reports to the police, in addition to the offenses for which he was being sentenced.

- 14 -

The record supports the trial court's findings. The Defendant's presentence investigation report shows two charges for driving with a revoked license that occurred within months of one another. The record also reflects the Davidson County theft from Walmart, about which the Defendant testified that the charge was dismissed upon his payment of restitution. The Defendant admitted to providing false reports to police officers on two separate occasions in order to fraudulently obtain additional pain medication. He testified that while working at St. Thomas Hospital and while working for Dr. Blythe, he fraudulently obtained and used prescriptions to get pain medication numerous times. The Defendant was terminated from both places of employment for this conduct but never prosecuted. Detective Wright testified to the Defendant's use of his dog to obtain prescriptions for alprazolam for his own use, and the Defendant's passing a worthless check at the animal hospital. Further, the Defendant admitted to illegally purchasing and using heroin and fentanyl. The Defendant's criminal conduct continued from 2017 to 2019. In addition to the Defendant's uncharged criminal conduct, the Williamson County grand jury issued four indictments charging the Defendant with twenty counts of criminal offenses occurring on different dates. As part of the plea negotiation, the State agreed to a dismissal of ten of the charges; however, there was adequate evidence in the record to indicate that the Defendant engaged in the criminal activity charged.

The trial court found the Defendant's record of criminal activity was extensive. Tennessee Code Annotated section 40-35-11(b)(2) permits a trial court to impose consecutive sentences if it "finds by a preponderance of the evidence that . . . [t]he defendant is an offender whose record of criminal activity is extensive." T.C.A. § 40-35-115(b)(2). The trial court's finding of an extensive criminal history, which is amply supported by the record, is "a sufficient basis for the imposition of consecutive sentences." *Pollard*, 432 S.W.3d at 862.

Accordingly, the trial court did not err in ordering partial consecutive sentencing. There was ample evidence in the record supporting the factor relied upon by the trial court to order consecutive sentencing in this case. *See State v. Adams*, 973 S.W.2d 224 (Tenn. Crim. App. 1997) ("Extensive criminal history alone will support consecutive sentencing."). The Defendant is not entitled to relief.

## III. Conclusion

Based on the foregoing, we affirm the trial court's judgments.

_____
ROBERT W. WEDEMEYER, JUDGE